Union Bridge Co. v. Teehan.

---

## Union Bridge Co. and the Elmira Bridge Co. v. Timothy J. Teehan.

92   259
s190s 374

1. NOTICE—*To a Foreman, of Defects in Machinery.*—Notice of the condition of machinery to the immediate foreman in charge of workmen, is notice to the employer.

2. MASTER AND SERVANT—*Liability of the Master for a Failure to Furnish Safe Appliances.*—The master is liable for injuries resulting

from his failure to furnish reasonably safe machinery and appliances
with which to do his work.

3.  DAMAGES—*Where $10,000 is Not Excessive.*—A bridge and iron
worker who had learned the trades of plumbing and gas-fitting, twenty-
nine years of age, in good physical condition, earning $3.30 per day,
was injured by reason of a defect in the machinery with which he was
working.  He was examined by an experienced physician in June, 1897,
less than two months after the accident, and again in February, 1898;
when first examined he was at a hospital, and had a severe crushing
injury over the right eye; the bone crushed in and the chin cut, leaving
a scar over two inches in length; the nerve which supplied the lower
part of the head was cut, so there was no feeling over the face two or
three inches in area; also a severe inflammation about the right elbow,
which was much swollen, and no movement possible at the joint; his
right arm was very much wasted and smaller than the left; he walked
with a limp; there was a tenderness near the outer side of the hip joint
and a bruising of the bone.  At the second examination he had
improved, but the loss of feeling was permanent, as was also the injury
to the arm, as to which latter injury he gave it as an opinion that there
was little hope of improvement, and that the injury to the hip was not
of a permanent nature.  It was held that a verdict for $10,000 was not
excessive.

Trespass on the Case, for personal injuries.  Appeal from the Supe-
rior Court of Cook County; the Hon. JOSEPH E. GARY, Judge, presid-
ing.  Heard in this court at the March term, 1900.  Affirmed.  Opinion
filed November 22, 1900.

O. W. DYNES, attorney for appellants.

JUDD & HAWLEY, attorneys for appellee.

MR. JUSTICE WINDES delivered the opinion of the court.

This case was before this court on a former appeal by
Teehan, the present appellee, from a judgment *non obstante
veredicto* rendered by the Superior Court in favor of the
defendants below, the present appellants, which was reversed
and the cause remanded with directions to the Superior
Court to entertain a motion for a new trial by defendants,
or either of them, if one should be made, and if such motion
should not be made or should be made and overruled, then
to enter judgment on the general verdict.   84 Ill. App. 532.

When the case again came before the Superior Court

Union Bridge Co. v. Teehan.

the defendants made a motion for a new trial, which was heard before the Hon. Joseph E. Gary, upon the transcript of evidence and the several exhibits introduced in evidence on the trial of said cause as the same appeared in the bill of exceptions filed in said Superior Court, December 5, 1898, and as the same appeared in the transcript of the record filed in this court on the former appeal. The motion for new trial was overruled and judgment entered upon the general verdict for $10,000, from which this appeal is taken.

The pleadings, verdict and special findings appear from the report of the case on the former appeal and need not here be stated in detail.

It is claimed for appellants, in substance, first, that the general and special verdicts are contrary to and not supported by a preponderance of the evidence; second, that the negligence, if any, was that of a fellow-servant; third, that the notice of defect in the machinery was not brought to the knowledge of defendants; and, fourth, that the damages are grossly excessive.

The substance of the negligence alleged in the declaration is that the defendants failed to furnish reasonably safe and good machinery for doing the work at which plaintiff was engaged as their servant, in that a certain pin in said machinery, by which was held in position a certain lever, was loose, worn and defective, and by reason thereof became unloosened and slipped out of its place and failed to hold said lever in its proper position, and thereby a certain beam, upon which the plaintiff was at the time, was caused to fall from a great height, causing the injuries complained of.

The evidence shows that appellants were constructing the North-Western Elevated Railway in Chicago, having plaintiff in their employ, and used at the work certain hoisting machinery to raise and place in position the iron work of the elevated structure. The apparatus consisted of a derrick, which had a hoisting boom about sixty feet long, and a traveler, which furnished the power to raise and

lower the derrick boom, the power being transmitted by ropes or cables from the traveler to the derrick, the ropes being let out or wound up by the action of large spools, commonly called "nigger heads." When work was going on, the engine, which was a part of the traveler, was operated by one Kreider, and one Clayton was the spool man, whose business it was to manipulate the hoisting apparatus through the use of a spool and a lever connected therewith so as to hoist or lower, as was necessary, any material used in the work of building the railway. Teehan's work was to fasten the hoisting tackle to any material desired to be raised to position in the structure, to ride upon the load and steer it into place, which he did by means of a rope which he guided as he rode upon the load fastened to the end of the derrick boom.

At the immediate time of the injury the load upon which Teehan rode, consisting of an iron column or beam weighing some three tons, had been raised to a height of some thirty or thirty-five feet and was just upon the point of being lowered into position, when the boom to which the load was attached suddenly fell to the ground, which caused the injury to Teehan for which the judgment was recovered.

The machinery which operated the derrick boom was placed in or out of gear by means of the lever, which was kept in place when either in or out of gear, by means of an iron pin which passed through two holes in a horizontal bar connected with the lever at one end and with a clutch on the power shaft at the other. The pin, when not in one of the holes, hung from the horizontal bar by a small chain. When the pin was in the proper hole the machinery was out of gear; the lever could not move and the machinery could not get into gear so long as the pin remained in its place. The same was true when the machinery was in gear and the pin in the proper hole to keep it in gear. As we understand the evidence, so long as the machinery was in gear it would hold the boom in position, so that it could not fall, and when the machinery was out of gear there was nothing to sustain the boom except

an attachment known as a " dog " at the side of the spool, which worked in cogs or teeth, and when it was in proper position, prevented the spool from unwinding.  The accident was caused, as we think the preponderance of the evidence shows, by the machinery being thrown suddenly out of gear, thus throwing the whole weight of the boom and its load upon the " dog," which broke a cog or tooth into which it fitted and was thrown out of·place, thus causing the spool to unwind and the boom to fall.

The contested matter of fact is as to the condition of the pin which kept the lever in position.   Clayton, whose duty it was to operate the spool, testified that he used this pin sixteen times during the day while he worked there, about two months;  that the hole into which the pin fitted was worn and " the pin somewhat smaller than the hole, probably a thirty-second of an inch, so that it fitted loose into the hole;" that he reached across the " nigger head," put his hand on the pin to see if it was in its proper place so that the " nigger head " could not get out of gear, just before the falling of the boom, about a half a minute, and when he was about to slack the boom down, that the pin was in place, but that after the boom fell the pin was out of the hole, hanging on its chain; that for a month before the accident the pin was worn oily, and he had considerable trouble to keep it in place, and used a wooden wedge for that purpose when the machinery was out of gear; that he had seen the pin come out by the vibration of the engine and " pull out quickly;" also that he notified his foreman, Martin, of the condition of the pin and " nigger head " two or three weeks before the accident.

As shown by the photographs appearing in the record, this hoisting machinery has five large spools or "nigger heads " similar to the one in question.   The witness Ash, who operated the spool in front of Clayton, corroborates him as to the manner in which the accident happened, except that on direct examination he said that the spool was out of gear, but later in his examination it appears that he did not know, and we think from all the evidence that

while the spool was out of gear a very short time before the accident, it was in gear immediately before the accident, and was thrown out of gear either because Clayton had not secured the lever by the pin, or that the pin came out by reason of the vibration of the machinery. The jury found in answer to special interrogatory three, that the original cause of the injury was not due to the negligence of Clayton. The jury also found in answer to the fourth special interrogatory, that Clayton could not by the use of ordinary care, at and immediately before the happening of the injury, have avoided or prevented the falling of the boom. We think it follows from these two special findings of the jury, in view of the evidence and their general verdict, that the machinery immediately before the accident was in gear, the pin in its proper place, and was thrown out of gear by the pin falling out of the hole by reason of the vibration of the machinery. We are not prepared to hold that such finding could be said to be manifestly against the evidence. Ash testified also that he had worked there for six weeks prior to the accident; that "the pin was worn —had been used a big lot and was a little loose, and we used a wedge here to keep it in. * * * I used to see him (Clayton) hammer it in with a little bolt;" and when asked how long the pin had been loose, said he did not know; had always seen them use a piece of wood in it, and "saw a jar loose it." On cross-examination he said he saw Clayton using the wedge "right along from the time I was there."

The witness Arcand, who was also a spool man, and was present at the time of the accident, though he saw the line go out but did not see just how it was caused, said that he had worked there for six weeks; that he had noticed the pin and hole in question near Clayton's spool, and that he saw the pin come out previous to the time the accident occurred; that the lever shaking like that (indicating a trembling motion), with the engine working, caused it. "The pin worked out and dropped out itself a couple of days before the accident—about a week or so." There is no contest but that the pin was out, hanging by its chain, immediately after the accident.

As against the evidence of these three witnesses, the appellants called Martin, who was appellee's and Clayton's foreman, who denied that he had had any notice from Clayton that the pin and "nigger head" were in bad condition, and several witnesses, including Martin, the general superintendent of the work, Cartlidge, who was absent at the time of, a few days before and a few days after the accident, and the temporary superintendent at the time of the accident, Boggs, who testified that the pin in question was not worn and defective, nor loose, but some of them admit that the play was about the same as testified to by Clayton; that the pin would not come out from the vibration of the machinery; that they saw tests made by running the machinery with the boom light, that is, without any weight attached to it such as it had at the time of the accident, and that the pin did not come out at any of these tests.

The appellants also called a number of expert machinists and engineers, who gave it as their opinion that the pin in question would not come out by reason of the vibration of the machinery; that they too saw tests made of the machinery, the same as the other witnesses, and said that the pin did not come out during such tests, or show a tendency to come out. A number of the witnesses who testified as to the tests made of the machinery, gave it as their opinion that there would be more vibration of the machinery when the boom was light than there would be when it was loaded, as at the time of the accident. The witness Kreider, who was the engineer operating the machinery at the time, and testified that he made a test immediately after the accident to see if the pin would fall out, says that Clayton told him at that time that the pin fell out and that was why he made the test.

Appellants also produced in court and offered in evidence what the witness Cartlidge testified was a lever, bar and cap of a shift box, including the same pin, chain and connections which were a part of the machinery at which the plaintiff was hurt, but it appears that this witness was absent at the time of the accident and had been for several

days before, and did not return until several days after the accident, and identified the parts of the machinery in question only from memory and certain manufacturers' marks upon them. Other witnesses to whom these parts were shown, said they resembled the parts of the machinery at which the plaintiff was hurt, but they were not positive in the identification, and it was for the jury to say whether or not, from all the evidence, the parts of the machinery offered in evidence were in fact the same as belonged to the machinery at which the plaintiff was injured.

After the most careful consideration of all the evidence, in the light of the arguments of counsel and considering the fact that the learned trial judge who passed upon the motion for a new trial did not hear the witnesses testify, but only considered the evidence as it has been presented to us, we can not say that the verdict of the jury finding the defendants guilty is manifestly against the evidence. We can not on this record, not having the witnesses before us as did the jury, take the responsibility of saying that it was impossible for this accident to have happened in the manner in which the testimony of the three witnesses for appellee tends to show that it did happen, nor that we should disbelieve these witnesses, who purport to testify to actual facts and take, in preference, the opinions of experts, based upon experience and tests of the machinery, which they admit were made under different conditions than existed at the time of the accident.

The claim that Clayton was a fellow-servant, that his negligence was the cause of the accident, and that on that account there could be no recovery, needs no special consideration, in view of the foregoing conclusions, because, even if his negligence may have been a concurring and efficient cause of the accident and he was a fellow-servant, both of which matters the jury have found against the appellants, still that would not relieve them from the duty of furnishing to appellee reasonably safe machinery and appliances with which to do his work. Hines Lumber Co. v. Ligas, 172 Ill. 315–20; Consol. Coal Co. v. Haenni, 146 Ill.

614–23; R. R. Co. v. Dudgeon, 83 Ill. App. 528; affirmed 184 Ill. 478-87.

As to the claim that the appellants were not notified of the condition of the machinery, and that the notice to the foreman, Martin, was insufficient, because he was not charged with the repairs of the machinery, can not be maintained. The jury were justified in finding from the evidence that the bad and worn condition of the pin and hole had existed a sufficient length of time that the appellants should in the exercise of ordinary care have known of its condition. Moreover, Martin was the immediate foreman of the plaintiff and Clayton, and while it was not Martin's duty to see to the repairs of machinery, if Clayton is to be believed, Martin assumed to look after the matter, for he, Martin, on being told of its condition, went to the engine room immediately. We think that as to the plaintiff, Martin being his immediate foreman, notice to Martin was a notice to appellants. Goldie v. Werner, 151 Ill. 551–8; Falkenau v. Abrahamson, 66 Ill. App. 352–6.

The claim that the damages are excessive must also be determined against appellants. The plaintiff testifies that he is twenty-nine years of age, and before the accident was never sick a day in his life, was in good physical condition, was a bridge and iron worker by trade, had learned the trades of plumbing and gas fitting, and was earning when injured $3.30 a day; that he was knocked senseless and did not come to until his arm had been partially set; that he suffered a compound fracture, running into the elbow joint of his right arm, also a fracture of his skull, the inner and outer tablet being broken, and injury over the eye, a severe injury on his hip, and was hurt through the region of his kidneys; that he was sore at the time of the trial, could not do heavy lifting, and was still suffering from the pain in his head, arm and hip; that he was in the hospital more than seven weeks, and at the time of the trial he was able to work at almost nothing with his arms.

Dr. Mayer, an experienced physician and surgeon, who had examined the plaintiff twice—first June 11, 1897, less

than two months after the accident, and again February 14, 1898—testified that when he first examined him the plaintiff was at the hospital, had received a severe crushing injury over the right eye, that the bone was crushed in and the chin cut, leaving a scar about two to two and a quarter inches long, and it had cut off the nerve which supplies that part of the head, so there was a loss of feeling over his face two or three inches in area, also a severe inflammation about the right elbow joint, which was then much swollen and no movement possible at the joint; that his right arm was very much wasted and smaller than the left; that he walked with a limp, and there was a tenderness near the outer side of the hip joint; that there had been a bruising of the bone; that at the second examination the plaintiff had improved; that the loss of feeling was permanent, as also the injury to the arm, as to which latter injury he gave it as an opinion that there was little hope of improvement, and that the injury in the hip was not of a permanent nature.

This evidence as to the nature and extent of the plaintiff's injuries is not contested, the appellants having made no proof in that regard; but it is claimed that because the employment of an iron worker is never constant, as shown by the evidence, that his earning capacity was not impaired, because it is shown by the evidence that at the time of the trial he was getting as an iron worker thirty cents a day more than before the injury. Even admitting that plaintiff could not get constant employment as an iron worker, he was, as we have seen, a plumber and gas fitter, and by these trades might have been employed had he not been injured. As to the fact of his getting thirty cents more per day at the time of the trial than when he was injured, that is explained by the testimony of plaintiff, who says that it was a temporary job which only required him to give signals, and that he was only put on it through the sympathy of the contractor.

The matter of damages in such cases being one so peculiarly within the province of the jury, and considering the

nature, extent and permanency of plaintiff's injuries, and the fact that the verdict has been approved by a judge of the Superior Court of the widest and most extended experience in such matters, we do not think we should disturb it.

The judgment of the Superior Court is therefore affirmed.